UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                           :

MARLON PENN                              :

                                      :

                  Plaintiff,          :       11-cv-9137 (NSR)

      -against-                      :

                                      :       OPINION AND ORDER

THE NEW YORK METHODIST HOSPITAL and  :
PETER POULOS,                      :

                                      :

                  Defendants.       :
-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

        Plaintiff, Marlon Penn ("Plaintiff") commenced the instant action against his former

employer New York Methodist Hospital ("NYMH") and his former supervisor Peter Poulos

("Poulos") (collectively "Defendants"), seeking monetary damages for wrongful termination.  In

his second amended complaint, Plaintiff asserts two causes of action against Defendants, one for

discrimination and the other based on retaliation.  In particular, Plaintiff alleges Defendants

(1) discriminated against him on the basis of his race and religion, in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (NYMH only), and the Civil Rights

Act of 1866, 42 U.S.C. § 1981 (both Defendants), and (2) retaliated against him after he filed

charges with the Equal Employment Opportunity Commission and the New York City

Commission of Human Rights, in violation of Title VII, § 1981, the New York State Human

Rights Law, N.Y. Exec. L. §§ 290–301, and the New York City Human Rights Law,

Administrative Code of the City of N.Y. §§ 8-101 to -703.

        Defendants now move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss

plaintiff's second amended complaint for failure to state a claim upon which relief may be

granted.  Defendants assert that (a) the "ministerial exception" to discrimination cases bars the claims asserted by this ministerial employee against his religious institution employer, (b) the Religious Freedom and Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4, alternatively bars these claims, (c) certain claims are barred by the applicable statutes of limitations, res judicata and collateral estoppel, (d) Defendants are entitled to the "same actor inference" under discrimination jurisprudence, and (e) Plaintiff has not otherwise plausibly alleged discrimination or retaliation under Title VII and § 1981.  In light of the precedent governing res judicata and collateral estoppel, Plaintiff, in opposition to Defendants' motion, withdraws as against both Defendants the portion of his first cause of action alleging discrimination in the terms and conditions of employment on the basis of his race and religion in violation of § 1981.  (Pl.'s Opp'n Br. 16.)  For the following reasons, Defendants' motion to dismiss the complaint is granted in part and denied in part.

## I. PLAINTIFF'S COMPLAINT

In his second amended complaint ("Complaint"), Plaintiff asserts that he is an African-American, an ordained Methodist minister, and a Board Certified Chaplain.  He is qualified in the area of pastoral care, having earned Doctor of Ministry and Master of Divinity degrees in Pastoral Care.  Defendant NYMH, a New York not-for-profit corporation located in Brooklyn, New York, is a member of the New York-Presbyterian Healthcare System and a non-sectarian, voluntary institution.  NYMH has a Pastoral Care Department which is supervised by Defendant Poulos.  The Pastoral Care Department runs a two-year Clinical Pastoral Education program for resident chaplains, in which Plaintiff participated from 2002 until 2004.  Allegedly, Plaintiff subsequently worked as a part time Staff Chaplain in the Pastoral Care Department from July 2004 until December 6, 2011.  During his tenure as a part-time Staff Chaplin, Plaintiff worked an

eight-hour shift each Wednesday and three consecutive eight-hour shifts from 9:00 a.m. Sunday through 9:00 a.m. Monday.  Throughout the term of his employment, Plaintiff was "primarily responsible for ministry" to certain NYMH patients and their families.

Beginning in 2004 and throughout his employment, Plaintiff requested that Poulos assign him more work hours and/or applied for a full-time Staff Chaplain position, but Poulos denied each request claiming there were not enough hours available.  Plaintiff alleges, however, that in September 2006 NYMH hired a Jewish rabbi as a full-time chaplain without advertising the position or interviewing Plaintiff.  In 2010, when another full-time chaplain—a Catholic nun—retired, Plaintiff applied for her position.  Despite his tenure there, Plaintiff's application was purportedly denied because, according to Poulos, NYMH needed to fill the vacancy with a Catholic chaplain.  Notwithstanding this representation, in or about August 2010, Poulos hired a non-Catholic, Asian woman to fill the retiring nun's position.  Soon thereafter, Plaintiff's work hours were purportedly reduced.

Believing Defendants were discriminating against him, on or about September 8, 2010, Plaintiff filed a complaint alleging employment discrimination on the basis of race and religious creed against NYMH and Poulos with the New York City Commission on Human Rights ("HRC") and with the Equal Employment Opportunity Commission ("EEOC").  The HRC dismissed Plaintiff's complaint on July 27, 2011, and the EEOC sent Plaintiff a notice of right to sue, dated September 22, 2011, adopting the findings of the HRC.  Thereafter, Plaintiff commenced the instant action within 90 days of the notice of right to sue.

During the first six years of his tenure at MYMH, Plaintiff purportedly was never written up or disciplined.  Plaintiff asserts his "work performance was consistently outstanding" as

evidenced, *inter alia*, by glowing "Appraiser's Comments" made by Poulos.[1]  By contrast, Plaintiff alleges that after he filed complaints with the HRC and the EEOC, Poulos subjected Plaintiff to verbal abuse, became hostile, and yelled at Plaintiff while visibly angry.

In addition to the verbal abuse, Plaintiff alleges that: on or about October 14, 2010, Poulos issued Plaintiff a memo or write-up concerning an alleged failure to make documentation in a duty log; on or about October 30, 2010, Poulos made negative comments on an evaluation concerning Plaintiff's need "to develop greater ability to discern what needs to be communicated and what does not"; in December 2010, Poulos gave holiday greeting cards containing money to all pastoral care staff except Plaintiff; on or about January 10, 2011, Poulos informed Plaintiff that Human Resources denied Plaintiff's request for time off to attend a Martin Luther King Day celebration despite the fact that, previously, permission was routinely granted for such requests; on or about March 25, 2011, the NYMH Employee Relations Manager called to direct Plaintiff to report to Human Resources on March 28, 2011, without giving a reason, and "told [Plaintiff] that if he refused to comply with a direct order from Human Resources his employment could be terminated"; on or about April 11, 2011, Human Resources issued Plaintiff an official warning as a result of disciplinary charges for alleged insensitivity toward an interracial couple and failure to follow protocol regarding a fetal demise—issues previously handled within the Pastoral Care Department—but Human Resources "refused to provide [Plaintiff] with a copy of the alleged patient complaint"; on or about June 10, 2011, "Poulos wrote plaintiff a memo or write-up concerning alleged improper documentation and communication of pertinent information"; on or

---

[1] In a September 2005 evaluation, Poulos allegedly described Plaintiff as "conscientious and reliable."  In a September 2008 evaluation, Plaintiff asserts that Poulos commended Plaintiff for conducting a "very effective & much appreciated" memorial service.  In a September 2009 evaluation, Poulus described Plaintiff as "a valuable member of the Pastoral Care team" who "maintains an active, on-going Pastoral care to staff."

about June 14, 2011, Poulos did not inform Plaintiff of or invite him to a "perinatal bereavement service," whereas Poulos previously always invited Plaintiff to such services; on or about August 12, 2011, Defendants issued Plaintiff a memo or write-up concerning Shabbos candles; on or about November 21, 2011, Defendants summoned Plaintiff to their Human Resources Department, falsely accused him of sexual harassment and suspended him; and on or about December 6, 2011, Defendants terminated Plaintiff's employment.

## II. MOTION TO DISMISS STANDARD

On a motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "Although for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Ultimately, determining whether a complaint states a facially plausible claim upon which relief may be granted must be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

5

## III. MINISTERIAL EXCEPTION TO EMPLOYMENT DISCRIMINATION

Defendants assert that the "ministerial exception" doctrine—grounded in the Religion

Clauses of the First Amendment—applies to this case, such that the Title VII and § 1981

discrimination and retaliation claims must be dismissed.

The First Amendment states in pertinent part: "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof . . . ."  Thus, in *Hosanna-Tabor*

*Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 697, 702 (2012), the U.S. Supreme

Court recognized that the First Amendment prohibits the government from interfering with a

religious organization's right to hire and fire ministers.  In addressing the "ministerial

exception," the Court stated:

> Since the passage of Title VII of the Civil Rights Act of 1964 . . . and other
> employment discrimination laws, the Courts of Appeals have uniformly
> recognized the existence of a 'ministerial exception,' grounded in the First
> Amendment, that precludes application of such legislation to *claims concerning
> the employment relationship between a religious institution and its ministers*.
> We agree that there is such a ministerial exception.

*Id.* at 705–06 (emphasis added).  The Court further noted:

> The purpose of the exception is not to safeguard a church's decision to fire a
> minister only when it is made for a religious reason.  The exception instead
> ensures that the authority to select and control who will minister to the faithful—a
> matter 'strictly ecclesiastical'—is the church's alone.

*Id.* at 709 (internal citation omitted).[2]  Accordingly, where a court directs a religious group to

reinstate an unwanted ministerial employee, the state is deemed to have infringed the Free

---

[2] Plaintiff argues that even if there were a ministerial employee and a religious institution, the "ministerial exception" would not apply where nothing in the Complaint "involves any dispute about religious doctrine or dogma."  (Pl.'s Opp'n Br. 7.)  For this proposition, he relies on language in *Rweyemamu v. Cote* stating that "employment decisions [of a religious organization] may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions."  520 F.3d 198, 208 (2d Cir. 2008) (internal quotations marks and citation omitted).  Plaintiff's brief, however, ignores *Hosanna-Tabor* altogether.

Exercise Clause, which guarantees a religious group's right to direct its own practices "through its appointments." *Id.* at 706.  Furthermore, court-directed reinstatement "violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.*  Similarly, any award for monetary relief in lieu of reinstatement

> would operate as a penalty on the [religious group] for terminating an unwanted minister, and would be no less prohibited by the First Amendment . . . .  Such relief would depend on a determination that [the religious group] was wrong to have relieved [the ministerial employee] of [his or] her position, and it is precisely such a ruling that is barred by the ministerial exception.

*Id.* at 709.

Regarding employment discrimination cases against religious organizations, the Second Circuit Court of Appeals has noted that

> (1) Title VII and the ADEA are not inapplicable to religious organizations as a general matter; (2) [courts] will permit lay employees—but perhaps not religious employees—to bring discrimination suits against their religious employers; and (3) even when [courts] permit suits by lay employees, [they] will not subject to examination the genuineness of a proffered religious reason for an employment action.

*Rweyemamu v. Cote*, 520 F.3d 198, 207 (2d Cir. 2008).

"[B]ecause the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case,'" *Hosanna-Tabor*, 132 S. Ct. at 709 n.4 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010)), Defendants properly assert this defense in a motion to dismiss for failure to state a claim under Rule 12(b)(6) instead of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), *id.* (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002); *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 951 (9th Cir. 1999); *Natal v. Christian &*

7

*Missionary Alliance*, 878 F.2d 1575 (1st Cir. 1989).

### A. Ministerial Employees

For the ministerial exception to apply, Plaintiff must have been employed in a ministerial

capacity. *Hosanna-Tabor*, 132 S. Ct. at 705–06.  The Supreme Court declined to "adopt a rigid

formula for deciding when an employee qualifies as a minister." *Id.* at 707.  The Court explained

that "[t]he amount of time an employee spends on particular activities is relevant in assessing

that employee's status, but that factor cannot be considered in isolation, without regard to the

nature of the religious functions performed and . . . other considerations." *Id.* at 709; *see also*

*Rweyemamu*, 520 F.3d at 208 ("[C]ourts should consider the 'function' of an employee, rather

than his title or the fact of his ordination.").  In determining whether an employee is ministerial,

the Second Circuit also encourages courts to consider the nature of the dispute. *Rweyemamu*,

520 F.3d at 208.

In *Hosanna-Tabor*, a "called" teacher who was terminated from her position at a church-

owned and operated school sued for damages and reinstatement under the Americans with

Disabilities Act, alleging retaliation.  132 S. Ct. at 699–700.  The teacher began her employment

at the school as a "lay" teacher, but after completing classes in theology, obtaining the

endorsement of the local church district, and passing an oral examination—a six-year process—

she was "called" by the Hosanna-Tabor congregation to teach at the school as a "Minister of

Religion, Commissioned." *Id.*  After being diagnosed with narcolepsy, the teacher took

disability leave during the first part of a school year. *Id.* at 700.  When she informed the school

she was medically cleared to return to work, the principal expressed concern over her readiness

and informed her that a "lay" teacher had been hired to complete the school year. *Id.*  The

church congregation offered to pay a portion of her health insurance premiums in exchange for

her resignation as a "called" teacher, but she refused.  *Id.*  When the principal informed her that she would likely be fired, she replied that she would assert her legal rights.  *Id.*  The congregation subsequently voted to rescind her call on the basis of her insubordination, disruptive behavior, and the purported damage she had done to her working relationship by "threatening to take legal action."  *Id.* (citation omitted).  Subsequently, the teacher filed a complaint with the EEOC, which brought suit against the church and school on the teacher's behalf based on the ADA's prohibition of retaliation against individuals who "opposed any act or practice made unlawful by [the ADA]."  *Id.* at 701 (citing 42 U.S.C. § 12203(a)).  In finding that the teacher was a ministerial employee, the Supreme Court highlighted, *inter alia*, the fact that the church held her out as a minister, that the congregation undertook to review her "'skills of ministry' and 'ministerial responsibilities,'" that she undertook a lengthy process of education and training to become a "called" teacher, that she claimed a housing allowance on her tax return based on her religious employment, and that her job duties required providing religious instruction four days a week—all this despite the limited amount of time she spent performing religious duties compared to secular duties.  *Id.* at 707–09.

The Second Circuit has also previously addressed the issue of who is a ministerial employee.  In *Rweyemamu v. Cote*, an African-American Catholic priest complained that the bishop misapplied canon law in selecting a white priest for promotion instead of the plaintiff, and retaliated against him for filing a complaint with the EEOC and Connecticut's equivalent agency by terminating his employment, in violation of Title VII.  520 F.3d 198, 199–201 (2d Cir. 2008).  The fired priest also sought review of the bishop's decisions from the Congregatio Pro Clericis in Rome, which determined there was just cause for his termination based on "complaints regarding his homilies, complaints regarding his interaction with parish staff, . . . and the necessity of

giving a unified and positive witness to the people of the parish." *Id.* at 200 (citation omitted).

The Second Circuit found that the priest's claims fell squarely within the ministerial exception

because he was ordained by the Roman Catholic Church and his duties were determined by

Catholic doctrine. *Id.* at 209.  Because under Title VII jurisprudence the priest would have to

prove that the church's nondiscriminatory reasons for his termination were pretextual, such

judicial inquiry would have required "impermissible entanglement with religious doctrine." *Id.*

Similarly, in *Hankins v. Lyght*, a Methodist minister who reached the age of 70 was

forced into retirement by the terms of the Methodist Book of Discipline.  441 F.3d 96, 99 (2d

Cir. 2006), *on remand sub nom. Hankins v. N.Y. Annual Conference of the United Methodist

Church*, 516 F. Supp. 2d 225 (E.D.N.Y. 2008), *aff'd*, 351 F. App'x 489 (2d Cir. 2009).  Without

discussion, the Second Circuit noted that the plaintiff was "a minister with primarily religious

duties." *Id.* at 117.  The district court, ruling orally, initially dismissed the minister's age

discrimination suit for failure to state a claim upon which relief may be granted because the

ministerial exception barred the suit, *id.* at 100, and the Second Circuit ultimately upheld the

dismissal on these grounds, *Hankins v. N.Y. Annual Conference*, 351 F. App'x at 491.

In the instant action, Plaintiff "does not concede that he was a 'ministerial employee'"

but chooses "not to address the question."  (Pl.'s Opp'n Br. 6 n.2.)  The Court nonetheless

considers the question and finds that the well-pleaded allegations in the Complaint, accepted as

true, show that Plaintiff was a ministerial employee.  Plaintiff alleges that he was "*primarily*

responsible for ministry" to patients and their families, (Compl. ¶ 28 (emphasis added)), that is,

his duties were "fundamentally" or "principally" ministerial in nature, *see Webster's Third New

International Dictionary of the English Language Unabridged* 1800 (2002); *cf. Hosanna-Tabor*,

132 S. Ct. at 707–09 (finding "called" teacher to be ministerial employee despite the fact that

most of her time was spent on non-religious activities).  References in the Complaint to some of

Plaintiff's duties support Defendants' contention that Plaintiff's employment functions were

primarily religious in nature, such as his performance reviews wherein it is noted that he

"coordinated distribution of Bibles to all patient units," he "conducted an in-Hospital memorial

service for an employee who died," and he "maintain[ed] an active, on-going Pastoral care to

staff," (Compl. ¶ 29(b)–(c)); and references to providing communion to nurses and being in

charge of Easter services, (*id.* ¶ 24).

      Finally, to the extent it is proper to consider the nature of this dispute,[3] as in *Rweyemamu*,

Plaintiff alleges he was subject to adverse employment actions due to discriminatory animus.

However, the patient complaint over insensitivity and a co-worker's complaint of sexual

harassment, as evidenced by the allegations in the Complaint, necessarily implicate his fitness as

a Chaplain, his ability to fulfill the essential functions of his job, and the mission of the Pastoral

Care Department generally.  The dispute over these events involve the Department's spiritual

functions, *Rweyemamu*, 520 F.3d at 208, just as the complaints regarding homilies and relations

with parish staff impacted the cohesiveness of the church's witness in *Rweyemamu*, 520 F.3d at

200.

      **B. Religious Institutions**

      For the ministerial exception to apply, Plaintiff must have been employed by a religious

or religiously-affiliated group or institution.  *Hosanna-Tabor Evangelical Lutheran Church &*

*School v. EEOC*, 132 S. Ct. 694, 705–06 (2012).  "[I]n order to invoke the exception, an

employer need not be a traditional religious organization such as a church, diocese, or

synagogue, or an entity operated by a traditional religious organization."  *Hollins v. Methodist*

---

[3] *See supra* note 2 and accompanying text.

*Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007), *cited in Hosanna-Tabor*, 132 S. Ct. at 705 n.2. "[A] religiously affiliated entity is considered 'a "religious institution" for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics.'" *Hosanna-Tabor*, 132 S. Ct. at 706 (quoting *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 310 (4th Cir. 2004)).

In *Hosanna-Tabor*, the Supreme Court did not question whether the church-owned school was a religious group for purposes of the ministerial exception.  Nor, for that matter, has the Second Circuit questioned whether the Roman Catholic Church, *Rweyemamu v. Cote*, 520 F.2d 198 (2d Cir. 2008), the United Methodist Church, *Hankins v. N.Y. Annual Conference of the United Methodist Church*, 351 F. App'x 489 (2d Cir. 2009), or the Union of Reform Judaism, *Friedlander v. Port Jewish Ctr.*, 347 F. App'x 654 (2d Cir. 2009), were religious groups.  Yet the Second Circuit has not had the opportunity to determine whether hospitals and health care facilities can be deemed to be religious groups.  Other Circuits, however, have grappled with this very issue, and the determinations have been context-specific.

In *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, in which a terminated hospital chaplain brought Title VII and ADEA claims against her former employer, the hospital board consisted of four church representatives and their unanimously agreed-upon nominees, while the hospital's articles of association could not be amended without the approval of regional Episcopal and Presbyterian churches.  929 F.2d 360, 361–62 (8th Cir. 1991).  According to the Eighth Circuit, "[i]mportantly . . . , [the hospital] was acting as a religious institution as [the chaplain's] employer," since the "job description of the Chaplain position at St. Luke's state[d] that a Chaplain 'provides a religious ministry of pastoral care, pastoral counseling . . . and liturgical services for persons in the hospital.'"  *Id.* at 362 (citation omitted).  Based on these

12

facts, the Eighth Circuit affirmed a determination that the hospital was church-affiliated with "substantial religious character." *Id.* Similarly, in *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, the Fourth Circuit affirmed a finding that a retirement home was a religious institution for purposes of the ministerial exception under the FLSA, to which it applied the same standard as Title VII.  363 F.3d 299 (4th Cir. 2004).  In *Shaliehsabou* the retirement home was a "non-profit religious and charitable corporation whose mission, according to its By-Laws, is to serve 'aged of the Jewish faith in accordance with the precepts of Jewish law and customs, including the observance of dietary laws.'"  *Id.* at 301.  Additionally, all members of the home's board were Jewish; the home held twice-daily services at the on-site synagogue; each residence had a mezuzah on its door post; and the home abided by Jewish law, including its commitment to serving kosher meals in conformity with Jewish law.  *Id.*

Defendants cite *Hollins v. Methodist Healthcare, Inc.*, wherein the Sixth Circuit upheld the dismissal of ADA claims brought by a resident chaplain who was dismissed from a hospital's clinical pastoral education program after a psychiatric evaluation caused the hospital to perceive her as a threat of harm to the workplace.  474 F.3d 223, 224 (6th Cir. 2007).  The hospital was operated "in accordance with the Social Principles of The United Methodist Church[,] . . . [was] associated with the Conferences of the United Methodist Church," and the pastoral education program "was accredited by the Association of Clinical Pastoral Education."  *Id.*  However, the *Hollins* court merely assumed that the hospital was a religious institution and did not analyze the issue because the chaplain had not contested the two requirements of the "ministerial exception" in the district court.  *Id.* at 226.

Plaintiff insists that the pleadings and NYMH's Certificate of Incorporation give no support to Defendants' contention that NYMH is a religious institution.  The Complaint alleges

that NYMH "is a member of the New York-Presbyterian Healthcare System and a non-sectarian, voluntary institution" which is "not a 'religious institution' nor a 'religiously affiliated entity.'" (Compl. ¶ 16.)  This particular allegation combines factual matter, NYMH's non-sectarian character, with a "legal conclusion couched as a factual allegation" parroting language of the ministerial exception, which the Court declines to accept as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Furthermore, despite Plaintiff's argument that "non-sectarian" means non-religious, the term means "not having a sectarian character," i.e., "not affiliated with or restricted to *a particular religious group*," *Webster's Third New International Dictionary of the English Language Unabridged* 1538 (2002) (emphasis added), whereas "sectarian" means "of, relating to, or having the characteristic of one or more sects esp[ecially] of a religious character," *id.* at 2052.

Other pertinent portions of the Complaint allege that NYMH has a Department of Pastoral Care, that NYMH has a Clinical Pastoral Education program for resident chaplains, and that a Jewish rabbi, a Catholic nun, and a non-Catholic (presumably Protestant) Asian minister were full-time chaplains.  Drawing reasonable inferences from these allegations in favor of Plaintiff, *Iqbal*, 556 U.S. at 678, "draw[ing] on [this Court's] judicial experience and common sense," *id.* at 679, and given that the Complaint does not paint a clear picture as to the religious or nonreligious nature of NYMH, it is certainly plausible that NYMH is not a religious institution, considering that many secular hospitals have chaplains and accredited clinical pastoral education programs.

Regarding the Certificate of Incorporation, Plaintiff asserts that NYMH's relationship with the United Methodist Church was completely severed by a Restated Certificate of Incorporation filed with the New York Department of State on January 22, 1975.  That document

14

states:

> The certificate of incorporation, as heretofore amended, is hereby further amended (a) to delete provisions relating to the corporation's relationship with The United Methodist Church and (b) to change the number of trustees from forty to thirty-eight by deleting the requirement that the Bishop of the New York area of The United Methodist Church and the President of the Guild of Methodist Hospital be trustees, ex-officio.

(Eke-Nweke Decl. Ex. 2 (NYMH Restated Certificate).)  Accordingly, Plaintiff distinguishes NYMH from the hospital in *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991), where the board was made up of church representatives and their hand-picked nominees, and there was a clear subordination to both Episcopal and Presbyterian churches.  Plaintiff asks the Court to take judicial notice of the 1975 Restated Certificate and the fact that its "purpose" is devoid of any reference to religion.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)."), *quoted in Burfeindt v. Postupack*, 509 F. App'x 65, 67 (2d Cir. 2013).  Plaintiff, however, fails to provide the Court with the most recent Restated Certificate of Incorporation filed with the State on August 20, 1986.  (*See* Eke-Newke Decl. Ex. 3 (Certificate of Amendment filed February 25, 2013, listing each previous amendment and restatement).)  Thus, the Court declines to take judicial notice of a now-inoperable Certificate to determine whether NYMH is of a religious character.  Nevertheless, the Court accepts that in 1975 NYMH affirmatively removed provisions relating to its relationship with the United Methodist Church, and notes that such removal calls into question Defendants' position that NYMH is a religious institution.

In sum, based solely on the allegations in the Complaint and the 1975 Restated Certificate, the Court finds that Defendants have not demonstrated that NYMH is a religious

15

institution or religiously-affiliated.  Accordingly, Defendants have failed to meet their burden.

Defendants' motion to dismiss the action under the "ministerial exception" must be denied.

## IV. RELIGIOUS FREEDOM AND RESTORATION ACT

Defendants assert that the RFRA bars this action.  The RFRA was passed to restore

application of the "compelling interest" test to government burdens on the free exercise of

religion caused by "valid and neutral law[s] of general applicability."  *Rweyemamu v. Cote*, 520

F.3d 198, 201–02 (2d Cir. 2008) (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990))

(internal quotation marks omitted).  Under its terms,

> (b) Government may substantially burden a person's exercise of religion only if it
> demonstrates that application of the burden to the person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling
> > governmental interest.
>
> (c) A person whose religious exercise has been burdened in violation of this
> section may assert that violation as a claim or defense in a judicial proceeding and
> obtain appropriate relief against a government.

42 U.S.C. § 2000bb-1(b) to (c).  However, the RFRA does not "affect, interpret, or in any way

address that portion of the First Amendment prohibiting laws respecting the establishment of

religion."  *Id.* § 2000bb-4.

The RFRA "is unusual in that it amends the entire United States Code."  *Rweyemamu*,

520 F.3d at 202 (citing 42 U.S.C. § 2000bb-3(a) ("This chapter applies to all Federal law, and the

implementation of that law, whether statutory or otherwise, and whether adopted before or after

November 16, 1993.")).  Thus, in *Hankins v. Lyght*, 441 F.3d 96, 105–09 (2d Cir. 2006), the

Second Circuit held that the RFRA amended the ADEA.  Moreover, it is implicit from

*Rweyemamu* that the Second Circuit would have held that the RFRA amended Title VII had the

16

defendant not expressly waived the statutory defense.  520 F.3d at 201 ("The statutory argument

is not available in this case because defendants knowingly and expressly waived a RFRA

defense.").

 The Second Circuit has held that the RFRA applies to suits between private parties where

the federal government *could have* brought an action, as the EEOC could have chosen to assert a

plaintiff's federal discrimination claims on his behalf.  *Hankins v. Lyght*, 441 F.3d at 103.

Whereas the defendant church in *Hankins v. Lyght* expressly relied on "the ministerial exception,

the Free Exercise clause, and the Establishment Clause, claiming that applying the ADEA to the

church-minister relationship would substantially burden religion," 441 F.3d at 100, the *Hankins*

court initially stated that "the RFRA must be deemed the full expression of Congress's intent

*with regard to the religion-related issues before us* and [must] displace earlier judge-made

doctrines [i.e., the 'ministerial exception'] that might have been used to ameliorate the ADEA's

impact on religious organizations and activities," *id.* at 102 (emphasis added)—notwithstanding

the statutory language limiting the RFRA to burdens on Free Exercise, 24 U.S.C. § 2000bb-4.  In

a subsequent appeal of the same proceeding decided after *Rweyemamu*, however, the Second

Circuit acknowledged that the "RFRA, of course, cannot displace a constitutionally-mandated

rule" and held that the "ministerial exception" applied to bar the plaintiff minister's suit.

*Hankins v. N.Y. Annual Conference of the United Methodist Church*, 351 F. App'x 489, 491 (2d

Cir. 2009), *aff'g on other grounds* 516 F. Supp. 2d 225 (E.D.N.Y. 2007) *and modifying Hankins*

*v. Lyght*, 441 F.3d at 102.

 Here, Defendants argue that the RFRA applies because *Hankins v. Lyght* has not been

"overruled by the [Second Circuit] *en banc* or by the Supreme Court."  *Baraket v. Holder*, 632

F.3d 56, 59 (2d Cir. 2011).  Accordingly, despite Plaintiff's argument that the RFRA should not

apply, neither *Rweyemamu*'s dicta questioning the application of the RFRA between private parties because the RFRA "requires *the government* to demonstrate that application of a burden to a person is justified by a compelling governmental interest," 520 F.3d at 203 n.2, nor *Hankins v. New York Annual Conference*'s holding that in the end the "ministerial exception" actually applied, 351 F. App'x at 491, overrule *Hankins v. Lyght*'s holding that the RFRA applies to suits between private actors where the government could have enforced its own employment discrimination provisions, 441 F.3d at 103.

With respect to the RFRA, then, the issue to be decided is whether NYMH is a religious institution to which the application of Title VII and § 1981 would unlawfully burden the free exercise of religion. For the same reasons stated in the "ministerial exception" discussion, the Court finds that under the RFRA Defendants have not proffered sufficient evidence to demonstrate that NYMH is a religious institution, and the RFRA does not serve as a bar commencement of this action.

## V. TITLE VII STATUTE OF LIMITATIONS

Defendants assert that the applicable statute of limitations bars certain allegations of discrimination in Plaintiff's first cause of action, wherein Plaintiff alleges discrimination on the basis of race and religion by NYMH in violation of Title VII.

Under Title VII, for an aggrieved person to bring a private action for discrimination where he or she has "initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice," he or she must have filed charges with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *accord Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). The aggrieved person must also have received notification (known as a "right to sue" letter) that the

EEOC has dismissed the charges and must have brought suit "within ninety days after the giving of such notice."  42 U.S.C. § 2000e-5(f)(1); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 213–14 (2d Cir. 2006).  "The timeliness requirement of Title VII 'is analogous to a statute of limitations.'"  *McPherson*, 457 F.3d at 214 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996)).  Nonetheless, although "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges, . . . [Title VII does not] bar an employee from using the prior acts as background evidence in support of a timely claim."  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

Here, the Complaint alleges that on or about September 8, 2010, Plaintiff filed charges of employment discrimination on the basis of race and religion against NYMH and Poulos with the HRC and the EEOC.  The EEOC sent Plaintiff a "right to sue" letter dated September 22, 2011, adopting the findings of the HRC, and the instant action was brought on December 12, 2011, within the requisite 90-day period.  Accordingly, allegations concerning NYMH's failure to hire Plaintiff to the retiring nun's full-time position, due to discriminatory animus, were timely brought.  However, the alleged discriminatory actions which took place before November 12, 2009, are time barred, namely, NYMH's failure to hire Plaintiff full-time in 2006 when the rabbi was hired and its failure to give Plaintiff additional work hours between 2004 and 2009.

## VI. ALLEGATIONS OF ADVERSE EMPLOYMENT ACTIONS

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Furthermore, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . .

19

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Plaintiff asserts two separate claims under Title VII: for discrimination based on his race and religion, and for retaliation after filing charges with the EEOC and the HRC.  Plaintiff also alleges that Defendants' retaliatory behavior violated § 1981, which gives him "the same right to make and enforce contracts . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), including "the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," *id.* § 1981(b).

### A. Discrimination Based on Race and Religion

Defendants argue that the allegations concerning the failure to hire or promote Plaintiff in 2010 to the position of full-time chaplain because of his race or religion, and those alleging termination for the same reasons, do not "state a claim to relief that is plausible on its face" under Title VII.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff, on the other hand, asserts that the Complaint sets forth a *prima facie* case of discrimination based on race and religion— even though "[e]mployment discrimination claims need not contain specific facts establishing a prima facie case of discrimination."  *Fowler v. Scores Holding Co.*, 677 F. Supp. 2d 673, 679 (S.D.N.Y. 2009).  Although Plaintiff was already an employee of NYMH when he was passed over for the 2010 full-time position, in order to draw reasonable inferences in Plaintiff's favor, the Court analyzes the incident as both a failure to hire and a failure to promote.

### 1. Discriminatory Failure to Hire

To establish a *prima facie* case for failure to hire, Plaintiff must demonstrate "(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and

20

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1980).

Here, Plaintiff alleges that he is African-American, a protected racial class, and Methodist, a protected religious class. Plaintiff allegedly applied for the retiring nun's position and was qualified, having advanced degrees in pastoral care. Plaintiff alleges he was rejected despite his qualifications because Defendants wanted to replace the nun with another Catholic chaplain, and it can be inferred that some time passed after his application was denied during which Defendants continued to search for a candidate with his qualifications before finally hiring someone else. Thus, Plaintiff's allegations, taken as true, establish a *prima facie* case of discriminatory failure to hire. Defendants' motion to dismiss the discrimination claim for failure to hire must be denied.

### 2. Discriminatory Failure to Promote

"In order to establish a prima facie case for discriminatory failure to promote, the plaintiff must show 'that []he applied for an available position for which []he was qualified, but was rejected under circumstances which give rise to an inference of discrimination.'" *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications," *id.* (citing *McDonnell Douglas*, 411 U.S. at 802), "or if the position was filled by someone not a member of plaintiff's protected class," *id.* (citing *De la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996)).

Plaintiff alleges he was qualified for the full-time chaplain position for which he applied,

he was rejected, and it can be inferred that the position remained open for a while.  Plaintiff also

alleges NYMH eventually hired a person who was not African-American but Asian, such that the

racial discrimination claim can be maintained.  An inference of religious discrimination is not as

well-pleaded, since alleging that the Asian chaplain is "non-Catholic" does not differentiate her

from Plaintiff who, as a Methodist, is also "non-Catholic."  Nevertheless, the claim for failure to

promote because of religion is facially plausible, based on the inference that the position

remained open for a period of time after Plaintiff was rejected.  Thus, the motion seeking to

dismiss the discrimination claim for failure to promote must be denied.

### 3. Discriminatory Termination of Employment

 "In order to establish a prima facie case of discriminatory termination of employment,

the plaintiff must show that []he belongs to a protected class, that []he was performing h[is]

duties satisfactorily, and that []he was discharged under circumstances giving rise to an inference

of discrimination on the basis of h[is] membership in the protected class." *Gomez v. Pellicone*,

986 F. Supp. 220, 227 (S.D.N.Y. 1997) (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d

Cir. 1997)).  With respect to job performance, Plaintiff "need not demonstrate that his

performance was flawless or superior.  Rather, he need only demonstrate that he 'possesses the

basic skills necessary for performance of [the] job.'" *De la Cruz*, 82 F.3d at 20.

Here, Plaintiff alleges his "work performance was consistently outstanding" as evidenced

by the "several awards, accolades and/or commendations [he received] for his excellent work,"

including "several thank you notes, [a] Perfect Attendance Pin and [a] Gift Check in appreciation

of [his] dedication and loyalty[,] . . . appreciation for continuing to be 'pastor' for many staff,"

(Compl. ¶ 28), and "glowing 'Appraiser's Comments' made by [Defendant] Poulos" which

Plaintiff quotes, (*id.* ¶ 29).  However, the factual allegations concerning Plaintiff's termination

center exclusively around retaliatory treatment after filing charges with the EEOC and the HRC.

Thus, a claim under Title VII for termination on the basis of race or religion is not plausibly pled,

because showing retaliation for participation in protected activity does not equate to showing

termination due to discriminatory animus.  Defendants' motion to dismiss the claim for

discriminatory termination of Plaintiff's employment is, therefore, granted.

### B. Same Actor Inference

Defendants additionally assert that the "same actor inference . . . militates against the

plausibility" of the discrimination claim because Defendant Poulos was involved in both hiring

and firing Plaintiff.  As the Second Circuit has recognized,

> some factors strongly suggest that invidious discrimination was unlikely.  For
> example, when the person who made the decision to fire was the same person
> who made the decision to hire, it is difficult to impute to her an invidious
> motivation that would be inconsistent with the decision to hire.  This is especially
> so when the firing has occurred only a short time after hiring.

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (age discrimination case);

*accord Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).  "The inference is applicable so

long as one management-level employee played a substantial role in both the hiring and firing of

the plaintiff."  *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 198 (E.D.N.Y.

2009).  Despite Plaintiff's argument to the contrary, the "same actor inference" may apply in the

Title VII context.  *See Filozof v. Monroe Cmty. Coll.*, 411 F. App'x 423, 427 (2d Cir. 2011)

(Title VII racial discrimination claim); *Mastrolillo v. Connecticut*, 352 F. App'x 472, 474 (2d

Cir. 2009) (Title VII sex discrimination claim); *De la Cruz v. City of New York*, 783 F. Supp. 2d

622, 642 (S.D.N.Y. 2011) (Title VII national origin discrimination claim).  However, "the

inference is less compelling when a significant period of time elapses between the hiring and

firing."  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000) (seven years between

hiring and firing weakens inference); *cf. Campbell v. Alliance Nat'l, Inc.*, 107 F. Supp. 2d 234, 248 (S.D.N.Y. 2000) ("[W]here the interim period is under two years, the same actor inference remains significant.").

Here, it is unclear from the Complaint whether Poulos in fact had a hand in hiring Plaintiff.  Furthermore, the passage of time between Plaintiff being hired as a part-time chaplain in 2004 and Defendants' failure to hire or promote him to full-time in 2010 (and Plaintiff's termination in 2011) weakens the "same actor inference" to the point where it makes no substantial difference in the Court's determination that the allegations asserting discriminatory failure to hire or promote based on race and religion are plausibly pled.  Thus, dismissal of those claims is denied.

### C. Retaliation for Engaging in Protected Activity

Defendants aver that the Complaint fails to plausibly allege retaliation for filing charges with the EEOC and the HRC, under both Title VII and § 1981, because too much time passed between the filing and Plaintiff's termination such that a causal connection cannot be established. Defendants also assert that other actions of which Plaintiff complains are not adverse employment actions.  Plaintiff, on the other hand, argues that the Complaint alleges facts showing a *prima facie* case of retaliation sufficient to deny Defendants' motion to dismiss.

Courts in the Second Circuit "analyzing § 1981 claims . . . apply the same standards as in Title VII cases."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (citation omitted).[4]  Thus, as to both legal theories a plaintiff establishes "a *prima facie* case by

---

[4] The same standards also apply to the New York State and New York City Human Rights Laws.  *See Brennen v. City of White Plains*, 67 F. Supp. 2d 362, 372 (S.D.N.Y. 1999) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 n.4 (2d Cir. 1995); *Ortega v. N.Y.C. Off-Track Betting Corp.*, No. 97 Civ. 7582(KMW), 1999 WL 342353, at *3 n.2 (S.D.N.Y. May 27, 1999)) (discussing State law); *Rudow v. N.Y.C. Comm'n on Human Rights*, 123 Misc. 2d 709, 715 (Sup. Ct. N.Y. Cnty. 1984) (discussing City law), *aff'd*, 109 A.D.2d 1111 (1st Dep't 1985).

showing: (1) participation in a protected activity; (2) that the defendant knew of the protected

activity; (3) an adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action.  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)

(internal quotation marks omitted); *accord De Cintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d

111, 116 (2d Cir. 1987).

> With respect to the fourth element,

> Proof of causal connection can be established *indirectly* by showing that the
> protected activity was followed closely by discriminatory treatment . . . or through
> other evidence such as disparate treatment of fellow employees who engaged in
> similar conduct, or *directly* through evidence of retaliatory animus directed
> against a plaintiff by the defendant.

*De Cintio*, 821 F.2d at 116 (internal citations omitted).  With respect to establishing causation

indirectly, the Second Circuit "has not drawn a bright line to define the outer limits beyond

which a temporal relationship is too attenuated to establish a causal relationship between the

exercise of a federal constitutional right and an allegedly retaliatory action."  *Gorman-Bakos v.

Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).  Significantly, "district courts within

the Second Circuit have consistently held that the passage of two to three months between the

protected activity and the adverse employment action does not allow for an inference of

causation."  *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007)

(collecting cases); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The

cases that accept mere temporal proximity between an employer's knowledge of protected

activity and an adverse employment action as sufficient evidence of causality to establish a prima

facie case uniformly hold that the temporal proximity must be very close.") (internal quotation

marks omitted) (citing *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month

period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir. 1992) (4-month

period insufficient)); *cf. Gorman-Bakos*, 252 F.3d at 555 (inferring causal connection where retaliatory conduct spanning 5-month period followed three instances of protected activity by a few days, two months, and three months, respectively).  However, the Second Circuit has allowed for longer periods of delay where, for instance, retaliators reasonably could have waited for an opportune time to retaliate.  *See, e.g.*, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding 6-month period sufficient because prison officers could have waited for an opportune time to beat prisoner "to have a ready explanation for any injuries [he] suffered"); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (affirming finding that eight-month gap between EEOC complaint and retaliatory action suggested causal relationship because it was the first opportunity for retaliation).

Concerning adverse employment actions, "Title VII's anti-retaliation provision applies broadly to 'employer actions that would have been materially adverse to a reasonable employee or job applicant.'  Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)).  "'[P]etty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." *Id.* (quoting *White*, 548 U.S. at 68).  To determine what actions are materially adverse, courts must consider the particular circumstances of the case because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *White*, 548 U.S. at 69) (internal quotation marks omitted). Furthermore, "the alleged acts of retaliation need to be considered both separately and in the

26

aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (citation omitted).[5]

Here, Defendants insist that despite the litany of allegations contained in the Complaint, only Plaintiff's eventual termination qualifies as a potential retaliatory action, and thus the fifteen months between the EEOC and HRC charges and his termination is too much time to allow an inference of retaliation. Certainly, the instance of not being given a holiday greeting card with money in it and the time Poulos did not invite Plaintiff to a bereavement service seem to be petty slights. *Hicks*, 593 F.3d at 165. However, most of the other alleged instances of retaliation, in the aggregate, allow for the inference that Defendants subjected Plaintiff to closer scrutiny because he engaged in protected activity. These actions reasonably represent the times Defendants were able to find opportunities to nitpick Plaintiff's performance, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980), in such a way that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 57. Additionally, the allegations allow the inference that Defendant Poulos—who allegedly "subjected [Plaintiff] to . . . verbal abuse . . . became hostile . . . [and] yelled" at Plaintiff, (Compl. ¶ 40)—altered the way he treated Plaintiff's request for a day off and handled patients' complaints about Plaintiff specifically because Plaintiff filed charges with the EEOC and the HRC. Thus, Plaintiff states a claim for

---

[5] Because the Supreme Court explicitly rejected "'materially adverse change in the terms and conditions' of employment" as the definition of "adverse employment action," *White*, 548 U.S. at 60, 67 (citation omitted); *contra Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Knight v. City of New York*, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004), and because *Knight* was following the now-rejected definition when it stated that "[d]isciplinary memoranda and evaluations are adverse employment actions *only if* they affect ultimate employment decisions such as promotions, wages or termination," 303 F. Supp. 2d at 497 (emphasis added), the Court declines to limit the import of disciplinary actions in this manner, although the Court looks favorably on any such instances that satisfy *Knight*'s requirements.

retaliation, even if his subsequent termination was premised completely on valid reasons.

## Conclusion

For the reasons stated above, Defendants' motion to dismiss the Complaint is partially GRANTED only to the extent of dismissing Plaintiff's claim pursuant to 42 U.S.C. § 1981 for discrimination on the basis of his race and religion as against both Defendants, dismissing Plaintiff's Title VII claim against NYMH with respect to discriminatory actions which occurred prior to November 12, 2009, and dismissing Plaintiff's claim under Title VII for discriminatory termination of employment on the basis of race or religion.  The motion is otherwise DENIED.

Dated: Sept 30, 2013
          White Plains, New York

SO ORDERED:

_____  9/30/13

NELSON S. ROMÁN
United States District Judge