USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MARLON PENN

                Plaintiff,

-against-

THE NEW YORK METHODIST HOSPITAL and
PETER POULOS,

                Defendants.
------------------------------------------------------------X

11-cv-9137 (NSR)

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

      Plaintiff, Marlon Penn ("Plaintiff") commenced the instant action against his former employer New York Methodist Hospital ("NYMH" or the "Hospital") and his former supervisor Peter Poulos ("Poulos") (collectively "Defendants"), seeking monetary damages for wrongful termination. In his second amended complaint ("Complaint"), Plaintiff asserted two causes of action against Defendants, one for discrimination and the other based on retaliation. By Opinion and Order, dated September 30, 2013, the Court granted Defendants' motion to dismiss to the limited extent of dismissing Plaintiff's claims pursuant to 42 U.S.C. § 1981 for discrimination on the basis of his race and religion as against both defendants, dismissing Plaintiff's Title VII claim against NYMH with respect to discriminatory actions which occurred prior to November 12, 2009, and dismissing Plaintiff's claim under Title VII for discriminatory termination of employment on the basis of race or religion.

      Defendants now move, pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment on the remaining claims. Defendants assert that (a) the "ministerial exception" to discrimination cases bars the claims asserted by this ministerial employee against his religious

institution employer, and (b) in the alternative, no reasonable jury could find for Plaintiff on his claims of discrimination and retaliation. For the following reasons, Defendants' motion for summary judgment is granted.

## BACKGROUND

In the Complaint, Plaintiff asserts that he is an African-American, a Methodist, an ordained minister, and a Board Certified chaplain. (Compl. ¶¶ 14, 20.) Defendant NYMH, a New York not-for-profit corporation located in Brooklyn, New York, is a member of the New York-Presbyterian Healthcare System and is a non-sectarian, voluntary institution. (*Id.* ¶¶ 15–16.) NYMH has a Pastoral Care Department which is supervised by Defendant Poulos. (*Id.* ¶ 17.)

Defendants hired Plaintiff as a resident chaplain in January 2002, and then again as a Duty Chaplain in July 2004. (Plaintiff's Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1(b) ("Pl.'s 56.1"), ECF No. 108, ¶ 19.) As duty chaplain, Plaintiff worked one 24-hour weekend shift each week, from Sunday 9:00 a.m.-Monday 9:00 a.m., interacting with other chaplains for about 30 minutes on Monday mornings. (*Id.* ¶ 21.) From approximately 2004 to 2010, Plaintiff also worked a Wednesday shift. (*Id.* ¶ 22.) Over the years, Plaintiff repeatedly made requests to Poulos for additional hours, additional shifts, or a full-time position but was denied. (*Id.* ¶ 39.)

In his role as chaplain, Plaintiff was "primarily responsible for ministry" to patients and their families, and his responsibilities—among other things—included "distribut[ing] of Bibles to all patient units," "conduct[ing] in-Hospital memorial service[s]," "maintain[ing] an active, on-going Pastoral care to staff," "providing communion to nurses," and "[conducting] Easter services, (Compl. ¶¶ 24, 29(b)–(c)). Throughout his tenure at the Hospital, Plaintiff was commended on several occasions for his excellent work performance. (Pl.'s 56.1, ¶ 28(c).)

Plaintiff was awarded letters of approbation for his attendance, and Poulos described Plaintiff as "conscientious and reliable as Chaplain on Duty, functioning well in stressful situations." (*Id.* ¶ 28(b)–(c).)

In 2010, the Catholic Chaplain, Sister Therese Camardella, retired, leaving her position open for a replacement. (*Id.* ¶ 35.) Poulos told Plaintiff that Sister Therese's position was not available to Plaintiff (who is a Methodist) because the position would only be filled by a Catholic chaplain or a nun. (*Id.* ¶ 36(a).)  Poulos contends that he attempted to replace Sister Therese with a Catholic chaplain, but when he was unsuccessful, Poulos offered the position to Chaplain Joo Hong, who Defendants believed was the best qualified applicant for the position. (*Id.* ¶¶ 41–42.) Defendants allege that Poulos did not hire Plaintiff because he did not believe Plaintiff to be an acceptable candidate to replace Sister Therese, based on the fact that he could not provide "effective coverage." (*Id.* ¶ 36.) Plaintiff instead contends that this failure to promote decision was based on racial and religious discrimination. (*Id.* ¶ 43.) Poulos never discussed with Plaintiff any alleged work performance issues or inability to provide effective coverage. (*Id.* ¶ 36(e).) Based on the foregoing, on September 16, 2010, Plaintiff filed a discrimination complaint with the New York City Commission on Human Rights ("HRC"), alleging that Defendants discriminated against him on the basis of his race and religion. (*Id.* ¶ 55.) Plaintiff, however, did not succeed on his complaint with the HRC. (*Id.* ¶ 60.)

Prior to Plaintiff's filing of the complaint in September 2010, Poulos did not counsel Plaintiff, reprimand him, write him up, or subject him to any disciplinary action on account of his work performance at any time. (*Id.* ¶ 28(a).) Defendants claim that, after 2010, Plaintiff's work performance began to deteriorate, which eventually caused Defendants to terminate Plaintiff. (*See id.* ¶¶ 67–115 (detailing issues with Plaintiff's performance).) Specifically,

Defendants allege numerous instances of misconduct, including (i) failing to log activities regarding patients, (ii) failing to fill out a priest referral card for a patient, which led to the patient's demise without receiving his last rites, (iii) interacting with an interracial couple who had just suffered a fetal demise in an insensitive and inappropriate manner, (iv) conducting an Easter service for which he was unprepared and in which he was insensitive to Catholic attendees who wished to receive communion, and (v) sexually harassing a fellow chaplain. (*Id.* ¶¶ 67–115.)

Plaintiff, however, believes that all the allegations of poor performance were "trumped up" by Defendants, and the work performance complaints were procured by Poulos in order to create a basis to fire Plaintiff. (*See, e.g., id.* ¶ 72; *see generally id.* ¶¶ 67–115.) Specifically, Plaintiff alleges that on October 7, 2010, Poulos held a meeting with the Hospital's Employee Relations Manager and Director of Employee Relations, and at said meeting it was decided that "[the Employee Relations Manager] will work with Peter Poluos[]" to procure enough data for Plaintiff's discharge. (*Id.* ¶ 64(a).) For example, Plaintiff believes that Poulos encouraged the alleged sexual harassment victim to write an incident report detailing sexually inappropriate conduct and later rewarded the victim "by retaining her to do an 'unusual' third year [clinical pastoral education] Residency and ultimately promot[ing] her from the position of student chaplain … to the position of Chaplain Manager." (*Id.* ¶ 111.) Thus, Plaintiff believes the allegations of misconduct are pretextual reasons for his termination.

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

4

law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of any genuine dispute or issue of material fact by pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *id.* 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has fulfilled its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine dispute of material fact.  *Id.* 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)).  In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."), nor is it to determine a witness's credibility, *Anderson*, 477 U.S. at 249.  Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial."  *Id.* at

250.

## DISCUSSION

Defendants assert that the "ministerial exception"—grounded in the Religion Clauses of the First Amendment—applies to this case, such that the discrimination and retaliation claims must be dismissed.

The First Amendment states in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. AMEND. 1. Recently, the U.S. Supreme Court recognized the "ministerial exception" in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 702 (2012), where the Court ruled that the First Amendment prohibits the government from interfering with a religious organization's right to hire and fire ministers. As the Court explained:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 697. Thus, the Court held that the ministerial exception "bars an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Id.* at 698.

This Court previously examined the ministerial exception as applied in the instant case on the Defendants' motion to dismiss. The Court held that (1) Plaintiff was a ministerial employee, and (2) the present dispute involves questions that would require the Court to examine Plaintiff's

6

spiritual functions.[1] *See Penn v. New York Methodist Hosp.*, No. 11-CV-9137 NSR, 2013 WL 5477600, at *6 (S.D.N.Y. Sept. 30, 2013). The only question remaining is whether NYMH is a "religious institution" for purposes of the ministerial exception.[2] While examining this question, it is important to note that the Court agrees with *Musante v. Notre Dame of Easton Church*, No. CIV.A. 301CV2352MRK, 2004 WL 721774, at *6 (D. Conn. Mar. 30, 2004) that "[t]he ministerial exception should be viewed as a sliding scale, where the nature of the employer and the duties of the employee are both considered in determining whether the exception applies." *Musante* held that "[t]he more pervasively religious an institution is, the less religious the employee's role need be in order to risk first amendment infringement." *Id.* On the other hand, where an employee's role is extensively religious, a less religious employer may still create entanglement issues. *See Rweyemamu v. Cote,* 520 F.3d 198, 208 (2d Cir. 2008) ("The more 'pervasively religious' the relationship between an employee and his employer, the more salient the free exercise concern becomes."). This Court has already explained that Plaintiff's role was

---

[1] Though *Rweyemamu v. Cote,* 520 F.3d 198, 208 (2d Cir. 2008) held that "a plaintiff alleging particular wrongs by the church that are wholly non-religious in character is surely not forbidden his day in court," the *Hosana Tabor* Court explained that, in an employment discrimination suit, it is not essential for Defendant to allege a religious reason for the adverse employment decision. Instead, the ministerial exception is broader and encompasses most employment decisions regarding "who will minister to the faithful." *See Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 132 S. Ct. at 709 ("The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter "strictly ecclesiastical," []—is the church's alone.") (internal citations omitted).

[2] Plaintiff claims that, based on a representation made in a pre-motion letter, Defendants are estopped from arguing that NYMH is a religious institution. This argument is without merit. Plaintiff was notified of the argument when Defendants moved to dismiss on the ground that the ministerial exception applied, and thus, the parties conducted discovery as to the issue. Moreover, Plaintiff had notice of the argument in Defendants' moving papers, and the pre-motion letter is not binding on either party. *See In re AutoHop Litig.*, No. 12 Civ. 4155(LTS)(KNF), 2013 WL 5477495, at *12 (S.D.N.Y. Oct. 1, 2013) (rejecting argument that defendant waived Rule 9(b) objection by failing to specify it in pre-motion letter pursuant to the court's individual practices rules as "unavailing"); *JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C.*, No. 08 Civ. 2154(VM), 2011 WL 1796298, at *3 (S.D.N.Y. Apr. 22, 2011) (holding insufficient service not waived by omitting it from pre-motion letter).

pervasively religious. Plaintiff was "primarily responsible for ministry to certain NYMH's patients and their families." (*See* Compl. ¶ 28.) In light of Plaintiff's exceedingly ministerial role, application of the ministerial exception to a less religious institution may be warranted.

According to *Hosanna-Tabor,* a religious institution for purposes of the ministerial exception is not limited to traditional churches. *Hosanna-Tabor*, 132 S. Ct. at 706. Though the Second Circuit has not addressed the extent to which "religious institution" covers organizations other than traditional churches, other courts have held that—for purposes of the ministerial exception—religiously affiliated schools, hospitals and corporations can qualify as "religious institutions." *See Shukla v. Sharma*, 2009 U.S. Dist. LEXIS 90044, *14–15 (E.D.N.Y. Aug. 14, 2009) (citing *EEOC v. Catholic Univ.*, 83 F.3d 455, 461, 317 U.S. App. D.C. 343 (D.C. Cir. 1996) (church affiliated university); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989) (non-profit religious corporation). Courts confronted with the "religious institution" issue tend to examine the extent to which the organization has religious characteristics. For example, in *Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, a terminated hospital chaplain brought Title VII and ADEA claims against her former employer, and the court held that the chaplain fell within the ministerial exception because the hospital was acting as "an institution with 'substantial religious character.'" 929 F.2d 360, 362 (8th Cir. 1991) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 616, 91 S. Ct. 2105, 2113, 29 L. Ed. 2d 745 (1971)). Similarly, the Supreme Court—citing the Fourth Circuit— held that a "religiously affiliated entity is a 'religious institution' for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics." *Hosanna-Tabor*, 132 S. Ct. at 706 (quoting *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 310 (4th Cir. 2004)). Thus, this Court's task is to determine to what extent NYMH's mission and character incorporate

religious attributes.

Plaintiff contends that NYMH lost its religious character and affirmatively severed ties with the church when it amended its Certificate of Incorporation in 1975 and removed all reference to its "Church related character" and "relationship with The United Methodist Church." (*See* Pl.'s Brief, 7.) Though the Court recognizes that this amendment caused NYMH to sever all formal ties with The United Methodist Church, that fact is not dispositive of the inquiry. Severing a *formal* affiliation with the Church does not necessarily imply that the Hospital does not maintain any church-based relationship or have any religious characteristics.[3]

Defendants explain that although NYMH is no longer corporately owned by the Methodist Church, the hospital has always retained a "traditional relationship" with the church. (*See* Defs.' Brief, 16.) This is evidenced by the fact that the Hospital maintained "Methodist" in its title, despite an affirmative name change in 1993 when the Hospital affiliated with the New York Hospital. (*See* Deposition of Lyn Hill, ECF No. 101, Exhibit A, at 25:4-6.) In addition, the Hospital's mission statement explains that the Hospital has a historic relationship with the United Methodist Church and includes the objective of providing an active ecumenical program of pastoral care and conducting a clinical pastoral program. (*See* NYMH Employee Handbook, ECF No. 101, Exhibit C, at 6.) The Hospital Bylaws also require the Board to have—at all times— significant representation from the United Methodist Church. (Bylaws, ECF No. 101, Exhibit D, at 4, Art. III, Section 2(c).) Based on the foregoing and additional statements from the record, it is clear to the Court that NYMH continues to maintain a connection to the church and operate the

---

[3] For the same reason, the Court finds the NYMH statement in the publication titled "Communicating the UM Connection to Employees" that "it is no longer *formally* affiliated with a connectional unit of The United Methodist Church" unpersuasive. ("Communicating the UM Connection to New York Methodist Hospital Employees," UMA Journal, Vol. 1, No. 8 (1994), ECF No. 101, Exhibit E.)

Hospital with religious values. (*See* Deposition of Lyn Hill, NYMH Vice President of Communications and External Affairs, ECF No. 101, Exhibit A, at 24:12–19 ("We continue to have a pastor's clinic which is run several times a year, where Methodist ministers come to the hospital for a week and receive free health screenings and education about the hospital. We have a yearly philanthropic appeal to the Methodist churches in our community"; *Id.* at 26:20–22 ("Every employee when they come to orientation is reminded that the patients are human beings who are created in the image of God"); *Id.* at 26:7–11 ("We have a very rich chaplaincy program. We have a 24/7 chaplaincy program, which not necessarily the case at other hospitals. We have our own clinical pastoral education programs, which is the case at very few hospitals."; "Communicating the UM Connection to New York Methodist Hospital Employees," UMA Journal, Vol. 1, No. 8 (1994), ECF No. 101, Exhibit E (detailing how the hospital maintains its Methodist "connection" through its everyday values, financial support from the Methodist church, etc. and stating that "the Methodist influence lives on").)

  Plaintiff urges the Court to ignore these indicia of religious affiliation and to hold that the Hospital is not a religious institution because the "Welcome Letter" on NYMH's website and the publication entitled "Residency Program in Internal Medicine" state that NYMH is now a secular institution. Though NYMH may be primarily a secular institution, with regards to its employment of the Plaintiff, the Hospital was acting as a religious organization. *See Scharon*, 929 F.2d at 362 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971)) ("Importantly for our purposes, St. Luke's was acting as a religious institution as Scharon's employer, and Scharon's position as a Chaplain at St. Luke's was 'clergy.' While St. Luke's provides many secular services (and arguably may be primarily a secular institution), in its role as Scharon's employer it is without question a religious organization. … It cannot

10

seriously be claimed that a church-affiliated hospital providing this sort of ministry to its patients is not an institution with 'substantial religious character.'"). Plaintiff argues that the Department of Pastoral Care's mission was to provide "spiritual" care, rather than "religious" care, and therefore the institution was not a religious one, even in its employment of Plaintiff. (Pl.'s 56.1, ¶ 14.) First, the Court fails to see a meaningful distinction between spiritual and religious.[4] Second, as outlined above, though NYMH employs pastors of all faiths, it maintains a connection with the United Methodist Church, and its mission statement emphasizes an "ecumenical program of pastoral care." Therefore, insofar as Plaintiff is a Methodist and was responsible—at least in part—for preaching the Christian faith,[5] the relationship between Plaintiff and NYMH (specifically, the pastoral care department) was that of a religious employee and a religious institution. This case does not present the Court, nor will the Court venture out to decide, whether this holding would apply to a religious institution's employment of a minister, pastor, or chaplain of a different faith.

In light of the foregoing, the Court finds sufficient indicia of religious affiliation to create a First Amendment issue. Therefore, Plaintiff's claims are barred by the Free Exercise Clause and the Establishment Clause of the First Amendment, and the case must be dismissed.

---

[4] Black's Law Dictionary defines "spiritual" as "[o]f, relating to, or involving ecclesiastical rather than secular matters." SPIRITUAL, Black's Law Dictionary (10th ed. 2014). Webster's Dictionary defines "spiritual" as (1) of or relating to a person's spirit, or (2) of or relating to religion or religious beliefs. *See* http://www.merriam-webster.com/dictionary/spiritual (last visited 1/15/2015).

[5] For example, Plaintiff conducted Easter services at the Hospital and distributed Bibles. (Compl. ¶ 24.)

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED, and the Complaint should be dismissed in accordance with this opinion. The clerk is respectfully directed to terminate the motion at ECF No. 93 and close this case.

Dated: January 20, 2016
       White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge